COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Fulton and Friedman

UNPUBLISHED

MARY LANDON BENTON

v.      Record No. 0631-21-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE MARY BENNETT MALVEAUX
OCTOBER 11, 2022

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Rufus A. Banks, Jr., Judge

(Robert L. Wegman; The Law Office of Robert L. Wegman, P.L.C.,
on brief), for appellant. Appellant submitting on brief.

(Jason S. Miyares, Attorney General; David M. Uberman, Assistant
Attorney General, on brief), for appellee. Appellee submitting on
brief.

Mary Landon Benton ("appellant") was convicted in a bench trial of possession with intent

to distribute cocaine, in violation of Code § 18.2-248, and possession with intent to distribute

Suboxone, in violation of Code § 18.2-248(E1). On appeal, she contends that the trial court erred in

denying her motion to strike because the evidence was insufficient to sustain her convictions. For

the following reasons, we affirm the trial court's judgment.

## I. BACKGROUND

"'In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial.' Accordingly, we regard as

true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

drawn from that evidence." *Meade v. Commonwealth*, 74 Va. App. 796, 802 (2022) (citation omitted) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

On April 26, 2019, Detective Terra Cooley of the Chesapeake Police Department observed a white Nissan Altima on Bainbridge Boulevard. She "ran the tags" of the Altima and discovered that appellant was the car's registered owner and her license had been suspended. Cooley stopped the car after confirming from a DMV photograph that appellant was its driver.

As Cooley spoke with appellant about her suspended license, she noticed that there were two other people in the car, "a front seat passenger and a rear seat passenger." Cooley also smelled "an odor of marijuana coming from the vehicle." Appellant denied that there was any marijuana in the car and claimed that the odor might have been "from the house that she was just coming from." Cooley called for assistance and waited at the driver's side of appellant's car.

Officer Elberg arrived and Cooley asked appellant and the rear seat passenger, appellant's daughter, to get out of the car and stand with Elberg. Cooley then asked the front seat passenger to leave the car. Cooley testified that about thirty seconds elapsed between appellant and the front seat passenger exiting the car and that she did not see the front seat passenger make any "furtive movements" during that time. When the front seat passenger got out of the car, Cooley noticed that she had a "balled up" plastic bag concealed in her right hand. Cooley asked the passenger what was in her hand, and the passenger "clinched [sic] her fist" and "put her right hand behind her back." Cooley grabbed the passenger's right hand, and the passenger dropped two small bags on the ground that appeared to contain crack cocaine and marijuana.

Cooley arrested the front seat passenger. Shortly after she did so, Elberg asked appellant, "What else is in this car?" Appellant replied, "Nothing. I—I didn't even know if there was weed or anything."

- 2 -

After arresting the front seat passenger, Cooley searched appellant's car and found a purse sitting partially on the driver's seat and partially on the center console.[1] She identified the purse as appellant's because it contained appellant's I.D. card, as well as mail and other items bearing appellant's name. The purse also contained a silver digital scale with white residue on it, two cell phones,[2] and a Coach clutch. The clutch held two plastic bags, the contents of which Cooley suspected to be crack cocaine and powder cocaine; subsequent testing of the bags' contents by the Virginia Department of Forensic Science identified them as 6.72 grams of the former substance and 3.79 grams of the latter substance. The clutch also held $520 in twenty-dollar bills. Finally, the purse contained "another bigger wallet" that held identification cards in appellant's name and thirty-four individually packaged Suboxone strips. Cooley asked appellant if she had a prescription for Suboxone, and appellant replied that she did not.

Cooley arrested appellant. In doing so, she confiscated a third phone that appellant had just been speaking on and was still holding in her hand. When Cooley first said to appellant, "Let me see your phone," appellant pointed at her car and replied, "My phone's in there." After Cooley took the phone from appellant, she asked, "Whose phone is this?" Appellant responded, "That's my other daughter's phone." As appellant was placed in a police car, she called out to her daughter and said, "Get my phone and call [attorney] Joanne Spencer." At that point, Cooley approached appellant's daughter, who was standing nearby, with the recently confiscated phone in her hand. Cooley asked appellant's daughter, "Whose phone is this?" and she replied, "My mom's."

---

[1] Appellant acknowledges on brief that the purse was hers.

[2] Detective Cooley subsequently determined that one of these phones belonged to appellant's daughter and returned that phone to her.

After appellant was placed in the police car, Officer Elberg asked her if she had a prescription for the Suboxone. Appellant asked Elberg whether he would rather someone acquire Suboxone or "a heroin cap." Elberg replied, "So they're not prescribed to you?" and appellant responded, "No, they're not."

Detective Souther of the Chesapeake Police Department assisted Cooley during the traffic stop. Souther asked appellant why she had almost ten grams of cocaine, and appellant stated that she planned to attend a concert that weekend and "wanted enough for the whole weekend." When Souther asked appellant how much crack cocaine she smoked in a day, appellant did not answer. The detective also queried appellant about why she did not have any smoking devices with her if she was "such a heavy user." Appellant replied that she was on her way to work, and Souther then asked appellant "why she brought crack to work but not a smoking device. She again didn't answer."

Appellant was charged with possession with intent to distribute cocaine and Suboxone. At trial, the Commonwealth introduced testimony from Detectives Cooley and Souther, as well as video footage from police body cameras. The Commonwealth also introduced forensic records of text messages retrieved from two of the phones that Cooley had confiscated. The records showed that the phone appellant had been using just before her arrest, and which Cooley confiscated from appellant's person, had received a message the day before the traffic stop that stated, "You have 6 subs." That message elicited the response, "Yea." The sender then said, "Ok get with you later or tomorrow," and then, about an hour later, asked "Are you home got cash." Detective Cooley testified, without objection, that in her training and experience that series of texts "would be referring to Suboxone." Another text received by the phone on the morning of the traffic stop included the statement, "Hey can I come out to your work want to get

a 60 I got cash." Cooley testified, again without objection, that she understood that question to mean "that [appellant] is selling [$]60 worth of some sort of narcotic."

In addition, the Commonwealth introduced testimony from Sergeant Allen of the Chesapeake Police Department, who qualified as an expert in the fields of narcotics and narcotics distribution. Based upon the evidence presented, Allen opined that the drugs recovered in appellant's case were "inconsistent with personal use." In discussing the factors that led him to this conclusion, Allen first testified that the amount of crack cocaine was "more than any user possess[es] at one time," and instead represented the amount that might be consumed "over the course of maybe several weeks through repeated trips to their dealer." Allen further opined that if divided into the quantities commonly used recreationally, the crack would represent approximately thirty-five to seventy "separate doses." Allen had never encountered a recreational user who possessed such a large amount of the drug.

Allen also opined that the amount of powder cocaine found in appellant's purse was "more than what a general user of cocaine will possess at one time," but instead represented a "very common amount to buy as a start up or a business." He explained that such an amount could either be "cut" or sold "as is and they will make a little bit of money on it. And generally over time they will increase the amount they are purchasing, amount they are selling." Additionally, Allen testified that it would be "unusual for a user of crack cocaine to also possess powder cocaine," because crack provides a "much stronger" and "more intense" high; thus, "[o]nce you're used to that, you're not going to go back and use powder also." Allen acknowledged that "[t]here may be some user out there somewhere that goes back and forth," but stated that "it's rare to see that."

Allen further opined that the silver scale bearing a white powdery residue was "more indicative of [a] distributor . . . than it would be [of] a user." He stated that "[w]hile it's not

unusual that a user would have a scale to weigh their product, it is unusual that that scale [would] then have residue on it in the form of a product they were weighing." Allen explained that this was so because drug users that bring scales to a purchase utilize the scales to weigh packaged drugs and ensure they are not being short-changed; Allen had "never spoken to a user that . . . takes the cocaine out and puts it on a scale, keeps the bag and now we are just weighing out the powder. Generally . . . just the bag is placed on the scale." By contrast, when distributors weighed their product for sale it was "not unusual for them to place a product on the scale . . . and then take that product and place it into a bag."

Additionally, Allen testified that the possession of $520 entirely in twenty-dollar bills was a factor inconsistent with personal drug use, because a "$20 rock" was a "common amount" for dealers to sell "more times than not." He also opined that the presence of multiple phones, absence of smoking devices for crack cocaine, and the presence of an additional drug, Suboxone, supported his conclusion that the drugs were inconsistent with personal use. Suboxone, Allen stated, was "generally on the streets . . . shortened down to . . . sub," and it was "very common" for dealers of other drugs to also sell Suboxone strips. Allen also opined that the text messages recovered from the phone taken from appellant were "consistent with what we commonly see on [a] distributor's phone." He noted the use of "cryptic language" in some of the texts, and specifically testified about the conversation referencing the sender's desire to "get a 60." Allen stated that "a numeric number sent to [the] phone of a distributor a lot of times . . . is the amount that that person is willing to spend," and opined that "want to get a 60 I got cash" likely referred to "$60 worth of crack."

At the close of the Commonwealth's evidence, appellant moved to strike and the trial court denied the motion. Natalie Gibson, a friend of appellant, then testified that she was a recovering heroin addict and had been prescribed Suboxone to treat her addiction. She further

testified that she had left "29 or 30" of her prescribed Suboxone strips, which were in a medicine bottle, in appellant's vehicle at the "[b]eginning of" April 2019. Gibson stated that she "freak[ed] out" after she arrived home and realized that she did not have her Suboxone, because a failure to take the drug would make her "really sick." She claimed that she had planned to meet appellant "first thing in the morning" to retrieve the Suboxone but that appellant was arrested that day. Gibson admitted, however, that she did not contact police about the Suboxone prior to trial.

At the close of all the evidence, appellant renewed her motion to strike. The trial court denied the motion and convicted appellant of possession of cocaine and Suboxone with the intent to distribute. In doing so, the trial court specifically found that Gibson's testimony was "incredible" and she had been impeached. The court noted that although Gibson testified that she had left her Suboxone in appellant's car at the beginning of April 2019, and that she would suffer severe consequences if she went without taking it, appellant was arrested with the Suboxone late in the month on April 26, 2019.

This appeal followed.

## II. ANALYSIS

Appellant argues that the evidence was insufficient to prove that she possessed the cocaine and Suboxone with intent to distribute them.

"In reviewing a challenge to the sufficiency of the evidence to support a conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Melick v. Commonwealth*, 69 Va. App. 122, 144 (2018) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

- 7 -

evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 30 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly*, 41 Va. App. at 257).

"To convict an individual of possession of a controlled substance, 'the Commonwealth must prove that the defendant was aware of the presence and character of the drugs and that [s]he intentionally and consciously possessed them.'" *Merritt v. Commonwealth*, 55 Va. App. 719, 733 (2010) (quoting *Castaneda v. Commonwealth*, 7 Va. App. 574, 583 (1989)). Such possession may be actual or constructive, and constructive possession "can be shown by 'acts, statements, or conduct of the accused or other facts and circumstances which tend to show that [she] was aware of both the presence and character of the substance and that it was subject to [her] dominion and control.'" *Bagley v. Commonwealth*, 73 Va. App. 1, 27 (2021) (quoting *Wilson v. Commonwealth*, 272 Va. 19, 27 (2006)). "Furthermore, proof that a person is in close proximity to contraband is a relevant fact that . . . may tend to show that, as an owner or occupant . . . of a vehicle, the person necessarily knows of the presence, nature and character of a substance that is found there." *Burchette v. Commonwealth*, 15 Va. App. 432, 435 (1992). "Ultimately, 'the issue [of what constitutes constructive possession] is largely a factual one' left to the trier of fact, not the appellate court." *Bagley*, 73 Va. App. at 28 (alteration in original) (quoting *Smallwood v. Commonwealth*, 278 Va. 625, 630 (2009)).

The drugs at issue in the instant case were found inside appellant's purse, which itself was found on the driver's seat and console of appellant's car, which she was driving. Appellant acknowledged her possession of the cocaine to Detective Souther; when Souther asked her why she had such a large quantity of the drug, she explained that she planned to attend a concert and "wanted enough for the whole weekend." Appellant compared acquiring the Suboxone strips to acquiring heroin when she admitted to Officer Elberg that she lacked a prescription for the Suboxone. Further, notwithstanding Gibson's testimony, which the trial court found incredible, appellant did not report to law enforcement that the Suboxone belonged to Gibson and the drug was found in appellant's wallet, not in Gibson's medicine bottle. Under these circumstances, a rational trier of fact could have found that appellant was aware of the presence and character of the drugs in her purse and that she intentionally and consciously possessed them. Accordingly, the trial court's finding that appellant possessed both the cocaine and Suboxone was not plainly wrong or without evidence to support it.

With respect to appellant's intent to distribute these drugs, appellant generally argues that "[t]here is simply nothing unusual about what was found in [her] purse." Rather, appellant claims that drug users "will often use scales to ensure they are given" the correct amount of drugs and that "[t]he money was an extremely small quantity when compared to what one would expect from a drug transaction." Moreover, appellant relies on Gibson's testimony to support her hypothesis of innocence that the Suboxone did not belong to her.

"'Possession with intent to distribute is a crime which requires an act [of possession] coupled with a specific intent.' Because direct proof of intent is often impossible to produce, it may, and frequently must, be shown by circumstantial evidence." *Barlow v. Commonwealth*, 26 Va. App. 421, 429 (1998) (citation omitted) (quoting *Stanley v. Commonwealth*, 12 Va. App. 867, 869 (1991) (*en banc*)). "This category of evidence 'is as competent and is entitled to as

much weight as direct evidence.'" *Green v. Commonwealth*, 72 Va. App. 193, 201 (2020) (quoting *Breeden v. Commonwealth*, 43 Va. App. 169, 177 (2004)).  "Accordingly, the fact-finder may consider such factors as the quantity of the drugs seized and the presence of equipment or other items related to drug distribution."  *Burrell v. Commonwealth*, 58 Va. App. 417, 434 (2011) (citing *McCain v. Commonwealth*, 261 Va. 483, 493 (2001)).  *See also Holloway v. Commonwealth*, 57 Va. App. 658, 666 (2011) (*en banc*) (noting additional factors that may be considered when determining if intent to distribute exists, including presence or absence of drug paraphernalia for personal use).  Further, "[a]n expert witness may use these factors to express an opinion on whether a defendant's possession of drugs was inconsistent with personal use."  *Burrell*, 58 Va. App. at 434 (citing *Askew v. Commonwealth*, 40 Va. App. 104, 109-10 (2003)).  The trier of fact is also "entitled to make reasonable inferences from the evidence presented at trial to determine whether the defendant possessed drugs with the intent to distribute them."  *Id.* (citing *Brown v. Commonwealth*, 56 Va. App. 178, 185 (2010)).

Where the Commonwealth relies upon circumstantial evidence, that evidence "must 'exclude every reasonable hypothesis of innocence,' but need not disprove every remote possibility of innocence."  *Barlow*, 26 Va. App. at 429-30 (citation omitted) (quoting *Pemberton v. Commonwealth*, 17 Va. App. 651, 655 (1994)).  "'[T]he hypotheses which must be . . . excluded are those which flow from the evidence itself, and not from the imaginations of' the defense."  *Haas v. Commonwealth*, 299 Va. 465, 468 (2021) (quoting *Cook v. Commonwealth*, 226 Va. 427, 433 (1983)).  Thus, "[t]he reasonable-hypothesis principle 'merely echoes the standard applicable to every criminal case.'  It is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'"  *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017) (citation omitted) (first quoting *Vasquez v. Commonwealth*, 291 Va. 232, 250 (2016); then quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

The reasonableness of a defendant's alternative hypothesis of innocence is determined by the trier of fact. *Gerald*, 295 Va. at 482.

Here, a rational trier of fact could have found that appellant possessed the cocaine and Suboxone with the intent to distribute them. Sergeant Allen, testifying as an expert in narcotics and narcotics distribution, opined that the quantities of Suboxone and cocaine found in appellant's purse were inconsistent with personal use. He further opined that if appellant's crack cocaine was divided into commonly used recreational quantities, the amount she possessed would equate to approximately thirty-five to seventy individual doses; such a quantity, Allen explained, was more than he had ever encountered in the possession of a recreational user. Appellant also possessed three grams of powder cocaine, which Allen opined was a "very common amount to buy as a start up or a business" but more than a "general user" would possess at one time. He also noted that it would be unusual for a crack cocaine user to also possess powder cocaine, because a user accustomed to the stronger and more intense high of crack was "not going to go back and use powder also."

Allen further opined that the scale, $520 in twenty-dollar bills, multiple phones, and text messages recovered from appellant's phone were inconsistent with personal drug use. He noted that residue on a person's scale was indicative of drug distribution rather than personal use because distributors weigh their product before packaging it in bags, while users simply weigh the bags to ensure they are not being shortchanged; Allen had never spoken with a user that removed drugs from their packaging to weigh them during a buy. Further, Allen opined that a "$20 rock" was a "common amount" of narcotics to sell. With respect to the text messages that were recovered from appellant's phone, Allen opined that Suboxone was often shortened to "sub" "on the streets" and that it was "very common" for distributors of other drugs to also sell Suboxone. He also opined that the text messages sent to appellant's phone from someone who

- 11 -

had "got cash" and was trying to "get a 60" referenced the sender's desire to buy "$60 worth of crack." Detective Cooley also testified, without objection, that in her training and experience the series of messages discussing "6 subs" and the sender having cash referred to Suboxone and that the texts expressing the sender's desire to "get a 60" meant that appellant was "selling [$]60 worth of some sort of narcotic." Although appellant implied during her arrest that the phone containing the text messages was not hers, appellant's daughter told police that the phone did belong to her mother; a rational trier of fact could have concluded that appellant's attempt to distance herself from the phone was an attempt to conceal her guilt. *See Poole v. Commonwealth*, 73 Va. App. 357, 369 (2021) (noting that a trier of fact is free to "discount" an appellant's "self-serving statements as little more than lying to conceal [her] guilt" (quoting *Becker v. Commonwealth*, 64 Va. App. 481, 495 (2015))).

Based on the totality of the evidence, a rational trier of fact could have found that appellant possessed the Suboxone and the cocaine with the intent to distribute them. That same trier of fact could also have found appellant's hypothesis that the Suboxone belonged to Natalie Gibson unreasonable and rejected that hypothesis. Gibson testified that the Suboxone belonged to her and that she would become "really sick" if she did not take it. However, she also stated that she left the drug in appellant's car in early April, and thus she would have been without it for weeks prior to appellant's arrest on April 26, 2019. During this time, she did not contact the police about her Suboxone. The trial court specifically found that Gibson's contradictory testimony about the Suboxone was not credible, and we agree. Moreover, appellant did not tell police that the Suboxone belonged to Gibson and offered no explanation why the Suboxone was no longer inside the medicine bottle Gibson claimed to have left it in. Under these facts and circumstances, the trial court did not err when it implicitly rejected appellant's hypothesis of innocence by convicting her of possession of Suboxone with intent to distribute.

## III.  CONCLUSION

The Commonwealth's evidence was sufficient for a rational trier of fact to convict appellant of possession with intent to distribute cocaine and Suboxone.  Accordingly, the trial court did not err in convicting appellant of those offenses, and we affirm the trial court's judgment.

*Affirmed.*