COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Fulton, Causey and Lorish


ELIJAH UNIQUE SAMUELS

v.      Record No. 1872-23-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*]
PER CURIAM
FEBRUARY 25, 2025


FROM THE CIRCUIT COURT OF HENRICO COUNTY
Richard S. Wallerstein, Jr., Judge

(John W. Parsons; John W. Parsons, Attorney at Law, on brief), for
appellant.

(Jason S. Miyares, Attorney General; David A. Stock, Senior
Assistant Attorney General, on brief), for appellee.


Following a jury trial, Elijah Samuels was convicted of first-degree murder and use of a

firearm in the commission of murder. On appeal, Samuels asserts that the evidence was insufficient

to prove he was the person who committed the offenses. Because we find that a reasonable fact

finder could conclude upon the totality of the circumstances that Samuels committed the murder, we

affirm his convictions.[1]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] The sentencing order incorrectly states that Samuels was convicted of first-degree
murder and *petit larceny*. We therefore remand this matter to the trial court solely for correction
of the final sentencing order.
    Additionally, after examining the briefs and record in this case, the panel unanimously
holds that oral argument is unnecessary because "the dispositive issue or issues have been
authoritatively decided, and the appellant has not argued that the case law should be overturned,
extended, modified, or reversed." Code § 17.1-403(ii)(b); Rule 5A:27(b).

BACKGROUND[2]

At around 1:30 a.m. on September 15, 2020, Henrico County Police Officer Sarah Sizemore responded to an apartment complex near Wood Creek Circle in Henrico County "for a suspicious situation in which a woman was hurt, screaming as if somebody was hurting her." Upon arrival, Officer Sizemore encountered a female named Maya Hunter and two males later identified as Daequon Glover and Samuels.[3] Samuels was wearing a white T-shirt, denim-colored jean shorts, and white sneakers. Hunter and Glover appeared "very relaxed" as they spoke with Officer Sizemore about the reason she was called to that location. Because all three gave different answers to her questions and because each one "pointed at different directions when asked where they were living or residing," Officer Sizemore thought they were lying about something. However, having no reason to believe there was a problem, Officer Sizemore left the area at around 1:35 a.m.

At approximately 2:00 a.m., Officer Sizemore was again dispatched to Wood Creek Circle, this time for a shooting. When she arrived, Officer Sizemore found Hunter standing over Glover, crying hysterically. Glover was lying on the ground, unconscious, and suffering from several gunshot wounds. Officer Sizemore noticed that Samuels was no longer there. Glover later died of his injuries. At trial, Glover's mother, Taneka Jackson, testified that although Hunter was Glover's girlfriend, Glover died because he "was helping [Samuels's] girlfriend."

Stacey Mello lived in an apartment on Wood Creek Circle with a balcony that faced a lighted parking lot. Mello called 911 twice on September 15, 2020. The first time was because she

---

[2] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] The interaction between Officer Sizemore and these three individuals was captured on Sizemore's body worn camera and played for the jury.

heard a man and a woman arguing in a manner she described as "very hostile." After the argument stopped, Mello looked down into the parking lot from her balcony and observed a man wearing what appeared to be "jeans shorts and a white shirt" walking near the dumpsters. She did not see a female. After a while, Mello heard the same man's voice arguing again, this time with another male. This second argument was followed by the sound of gunshots. As she was reporting the gunfire to 911, Mello saw a car speed away from the dumpster area and out of the apartment complex. At trial she described the car as black in color, having four doors, and being "non-American."

At around 4:30 a.m., Henrico County Police Officer Davis Wilcox was tasked with finding and surveilling two "suspect" vehicles in an apartment complex on Roxanna Road in Henrico. Upon his arrival, Officer Wilcox located a black Mercedes and a four-door Nissan Altima parked in front of Samuels's residence at 420 Roxanna Road. While standing outside the apartment obscured from view, Officer Wilcox observed a black male wearing a white T-shirt step outside and look around. The man stood outside the door for a few minutes until a female later identified as Samuels's girlfriend, Jakira Randolph, exited the apartment behind him and entered the Nissan. Randolph moved the Nissan a few spaces away from the apartment and then she and the male re-entered the residence. Officer Wilcox remained at that location until around 5:30 a.m.

At around 8:00 a.m., Henrico County Police Officer Charles Andrews initiated a "high risk or felony" traffic stop on the Nissan Altima upon a report that the passenger in the vehicle was wanted for the homicide.[4] Samuels was sitting reclined in the front passenger seat, and Randolph was in the driver's seat. Officer Andrews testified,

---

[4] Officer Andrews testified that a felony stop is "similar to a regular traffic stop, but instead of approaching the vehicle, we call out to the occupants of the vehicle and remove them one by one, typically starting with the driver."

- 3 -

> Initially we were giving commands for [Samuels] to keep his hands up. To which he initially put his hands up and then began disregarding putting hands in the air and reaching down towards the floorboard of the area. And at one point he attempted to exit the vehicle. We had to give additional commands to get him to remain inside the vehicle, which he did eventually comply with.

The officers removed Samuels from the car and arrested him.

As a member of the Forensics Unit of the Henrico Police Criminal Investigative Section, Detective Jennifer Shouse-Pearman went to the shooting scene at Wood Creek Circle. During her investigation there, Detective Shouse-Pearman located eight .45 caliber cartridge casings in various locations in and around the parking lot. She also located three bullet jackets and one core bullet. She submitted that evidence to the Department of Forensic Science (DFS) for analysis. Testing revealed that the casings and bullets recovered at the scene were manufactured by Sig Sauer and Sellier and Bellot (S&B), respectively.

Detective Shouse-Pearman also searched the residence at 420 Roxanna Road, finding both a standard size magazine and an extended magazine for a Glock .45 auto caliber firearm, and a box of .45 caliber cartridges. The ammunition recovered from Samuels's house was manufactured by Winchester. During a search of the black, four-door Mercedes, which was registered to Samuels, Detective Shouse-Pearman collected samples from the steering wheel, gearshift knob, and driver's door handle to submit to DFS for primer residue testing. The testing showed that primer residue was found on all three of those locations inside the car. Upon Samuels's arrest nearly eight hours after the shooting, Detective Matthew Rosser took samples from his hands to send to DFS for primer residue testing. Test results indicated the presence of primer residue on both of Samuels's hands.

DFS lab results showed that the bullets and bullet jackets recovered from the crime scene were fired from the same firearm, and the eight cartridge casings recovered from the crime scene were fired from the same weapon. However, Firearms Examiner James Bullock, testifying as an

expert, explained that without the actual firearm he could not state with certainty that only one firearm was used during the shooting. He did opine that the bullets and casings recovered at the crime scene were consistent with having been fired from a Glock .45 caliber automatic weapon.

Detective Rosser also collected videos from cameras located throughout the apartment complex where the shooting occurred. One of the videos showed Samuels and Randolph exiting an apartment and walking through the parking lot at 1:04 a.m. on September 15, 2020. Samuels was wearing a white T-shirt, denim-colored jean shorts, and white shoes, and he eventually turned away from Randolph, who kept walking, and returned to the apartment. Minutes later, the same video shows Samuels leaving the apartment wearing a backpack and walking in the direction where the shooting took place. At 1:58 a.m., another video captured muzzle flashes from gunshots occurring in the area where Detective Shouse-Pearman later recovered the cartridge casings and bullets. In that same video, Randolph can be seen just before the shooting walking to her Nissan Altima, entering her car, pulling forward to face "the direction of the homicide scene," and seconds later driving at a high rate of speed out of the parking lot. Moments later, on the same video, an individual wearing a white T-shirt can be seen running away from the location where the gunfire occurred. The person fleeing does not appear to be wearing a backpack.

Detective Rosser also recovered video from the front window of 420 Roxanna Road showing the area directly in front of the residence. On camera, the Mercedes registered to Samuels arrived at 2:32 a.m. on September 15, 2020, and an individual wearing a white T-shirt and denim-colored jean shorts exited the vehicle, met up with Randolph who was already there, and then both entered the residence. Detective Rosser testified that the drive from Wood Creek Circle to 420 Roxanna Road takes twenty-eight minutes.

At the conclusion of the Commonwealth's case, Samuels moved to strike, arguing that the Commonwealth's evidence failed to prove that Samuels was the person who shot and killed Glover. The trial court denied Samuels's motion. Samuels declined to present evidence and instead renewed his motion to strike, which the trial court also denied. Following deliberations, the jury convicted Samuels of first-degree murder and use of a firearm in the commission of murder. Samuels noted this appeal.

ANALYSIS

"In reviewing a challenge to the sufficiency of the evidence, we affirm the trial court's judgment 'unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.'" *Pulley v. Commonwealth*, 74 Va. App. 104, 123 (2021) (quoting *Poole v. Commonwealth*, 73 Va. App. 357, 363 (2021)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

It is well settled that "[a]t trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). However, as with "[a]ny element" of an offense, the Commonwealth may prove the defendant's

identity through direct or circumstantial evidence. *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). Indeed, "[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). "While no single piece of evidence may be sufficient, the combined force of many concurrent and related circumstances . . . may lead a reasonable mind irresistibly to a conclusion." *Id.* at 512-13 (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). Thus, our review "does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)). "In other words, in a circumstantial evidence case . . . the accumulation of various facts and inferences, each mounting upon the others, may indeed provide sufficient evidence beyond a reasonable doubt" of a defendant's guilt. *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011).

The evidence presented in this case, although entirely circumstantial, supported the jury's finding that Samuels committed the murder. Mello called 911 after hearing a hostile argument between a man and a woman in the parking lot of her apartment complex. After the argument ended, she observed a male wearing a white T-shirt and denim-colored jean shorts walking around outside; she did not see the female. Shortly thereafter, Officer Sizemore encountered Hunter, Glover, and Samuels standing together in the parking lot, and noticed that Samuels was wearing a white T-shirt, denim-colored jean shorts, and white sneakers. Hunter seemed very relaxed, belying the notion that she was involved in the argument, and Officer Sizemore thought the three were lying about something. Half an hour later, Mello again heard the man, whose voice she recognized from the first argument, arguing with a male immediately before she heard gunshots. While on the phone

with 911 again, Mello observed a black, four door, "non-American" car leaving the area at a high rate of speed. Video-surveillance from the apartment complex captured the muzzle flashes that occurred at around 1:58 a.m. and a man wearing a white T-shirt fleeing the location from where the shots were fired. As shots rang out, Randolph was also observed on camera leaving the crime scene. When Officer Sizemore responded to the shooting at around 2:00 a.m., she noticed that Samuels was no longer there.

A half-hour later, a camera captured Samuels's black, four-door Mercedes arriving at his house at 2:32 a.m., which was consistent with the duration of time it takes to drive from Wood Creek Circle to Samuels's residence on Roxanna Road. Randolph's vehicle was already parked in front of the house. A man wearing a white T-shirt and denim-colored jean shorts entered the house with Randolph. Gunshot residue was later recovered from the driver's door handle, gearshift knob, and steering wheel of the Mercedes, and upon his arrest, gunshot residue was found on both of Samuels's hands. Cartridge casings recovered at the scene were consistent with having been fired from a .45 caliber weapon, and a significant amount of .45 caliber ammunition was found inside Samuels's house. Randolph and Samuels then sought to avoid detection by police—both when Randolph moved her car away from the front door and when Samuels reclined in Randolph's vehicle during the felony traffic stop. At times, he disregarded the officers' instructions. "[T]he fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." *Langhorne v. Commonwealth*, 13 Va. App. 97, 102 (1991) (quoting *United States v. Ballard*, 423 F.2d 127, 133 (5th Cir. 1970)). Clearly, the accumulation of these facts and circumstances, each building upon each other, could lead a rational trier of fact irresistibly to the conclusion that Samuels was the killer.

While we acknowledge, as Samuels asserts, that no direct evidence proved his guilt, the circumstantial evidence pointing to him as the perpetrator is more than sufficient to overcome the assertions of innocence he offers. Contrary to Samuels's assertions, it is of no moment that Mello told police she thought the black car might be a Honda, or that Samuels wore a backpack before the shooting and the man fleeing from the scene did not have a backpack, or that the bullets and cartridges recovered from the scene were made by Sig Sauer and S&B rather than by Winchester, or that gunshot residue *typically* does not last for more than six hours on one's hands, or that the various witnesses gave differing descriptions about the color of Samuels's shorts, or that Hunter, Glover, and Samuels appeared calm when Officer Sizemore first encountered them, or even that Hunter did not name Samuels as the shooter in the 911 calls she made to police. These weaknesses in the Commonwealth's case were all presented to the jury at trial, and Samuels argued their importance during his closing argument. In finding Samuels guilty, the jury resolved these matters in the Commonwealth's favor. Because "[i]t is the prerogative of the trier of fact 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts,'" we defer to the jury's resolution of these evidentiary concerns. *Sierra v. Commonwealth*, 59 Va. App. 770, 776 (2012) (quoting *Brown v. Commonwealth*, 56 Va. App. 178, 185 (2010)).

It follows, with all conflicting matters resolved by the jury, the evidence proved that Samuels and Randolph argued loudly and rancorously in the Wood Creek Circle parking lot and that when Glover came to Randolph's defense, Samuels argued with Glover, shot and killed him, and then fled the scene.

CONCLUSION

We conclude, on the ballistics recovered from both Wood Creek Circle and Roxanna Drive, the video footage from both locations, the testimony of the various witnesses, the timeline

presented, and Samuels's attempts to conceal himself, a rational trier of fact could find that Samuels committed the offenses.  The evidence was sufficient to prove Samuels murdered Glover and that he used a firearm to do it.  We therefore find no error in the trial court and affirm the convictions, but remand solely to correct the final sentencing order.

*Affirmed and remanded.*